UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IAN ALBRIGHT,

                    Plaintiff,          Civil Action No. 16-14100
                                           Honorable Paul D. Borman
                                           Magistrate Judge David R. Grand

v.

SOCIAL SECURITY
COMMISSIONER,

                    Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 12]**

       Plaintiff Ian Albright ("Albright") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 12], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.     RECOMMENDATION**

       For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Albright is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Albright's Motion for Summary Judgment [9] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

II.     **REPORT**

A.      **Procedural History**

On July 29, 2011, Albright filed applications for DIB and SSI, alleging a disability onset date of December 28, 2009.  (Tr. 87-88, 287, 294).  These applications were denied at the initial level.  (Tr. 87-88).  Albright filed a timely request for an administrative hearing, which was held on March 14, 2013, before ALJ Oksana Xenos.  (Tr. 122, 136).  Albright, who was represented by attorney Gerald Skupin, testified at the hearing, as did vocational expert ("VE") Lawrence S. Zatkin.  (Tr. 122).  On April 23, 2013, the ALJ issued a written decision finding that Albright is not disabled under the Act.  (Tr. 119-40).  But on August 11, 2014, the Appeals Council vacated that decision and remanded the case for another hearing and a new decision.[1]  (Tr. 141-44).

The second administrative hearing was held on November 13, 2014, before ALJ Kendra Kleber.  (Tr. 39-86).  Albright was again represented by attorney Skupin, and testified at the hearing, along with VE Donald Hecker.  (*Id.*).  On January 5, 2015, the ALJ issued a written decision finding that Albright is not disabled under the Act.  (Tr. 8-38).  On September 29, 2016, the Appeals Council denied review.  (Tr. 1-5).  Albright timely filed for judicial review of the final decision on November 18, 2016.  (Doc. #1).  The parties filed cross-motions for summary judgment (Docs. #9, #12), and Albright filed a reply.  (Doc. #14).

---
[1]

In the Appeals Council's order, it instructed the ALJ to resolve the following issues on remand:

- Consider and weigh all third party statements – in particular, those made by Albright's parents – consistent with Social Security Ruling 06-03p;
- Further evaluate the opinion evidence offered by treating source Mark Deskovitz, Ph.D., ABPP;
- Ensure that the record is complete and evaluate any new medical evidence;
- Give additional consideration to Albright's residual functional capacity ("RFC"); and
- Obtain evidence from a VE to clarify the effect of the assessed limitations on Albright's occupational base.

(Tr. 142-43).

B.      **Framework for Disability Determinations**

Under the Act, DIB and SSI benefits are available only for those who have a "disability."

*See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec.

6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four

steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the

burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.     Background

#### 1.     The Record

Albright alleges disability as a result of depression, anxiety, generalized anxiety disorder, psychosis, racing thoughts, voices in his head, suicidal thoughts, a possible head injury, attention-deficit disorder, attention-deficit hyperactivity disorder, post-traumatic stress disorder, tics, symptoms of Tourette's, possible schizophrenia, insomnia, sleep apnea, and back trouble. (Tr. 341).  At the time of the administrative hearing, Albright was twenty-six years old.  (Tr. 47).

The Court has thoroughly reviewed the record in this matter, including Albright's medical record, Function Report, Disability Reports, and testimony as to his conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.     Vocational Expert's Testimony

Donald Hecker testified as an independent VE at the administrative hearing.  (Tr. 78-84, 502).  The ALJ asked the VE to imagine a hypothetical individual of Albright's age, education, and work experience who could perform work that involves no commercial driving and requires no exposure to hazards, such as unprotected heights or uncovered industrial machinery.  (Tr. 79-80).  The work is also limited to tasks that are routine and repetitive, but not necessarily simple. (Tr. 80).  The work is routine and predictable (defined as no more than occasional changes in the work to be performed or in the work setting), is low stress (defined as work that does not involve

an inflexible or fast pace), and does not involve team-oriented tasks.  (Tr. 80-81).  The VE testified that the hypothetical individual could perform jobs that exist in the national economy, such as:  cleaner/housekeeper (light work; Dictionary of Occupational Titles ("DOT") number 323.687-014; 240,000 jobs); packager (medium work; DOT number 920.587-018; 600,000 jobs); and clerical assistant (light work; DOT number 239.567-010; 300,000 jobs).  (Tr. 81-82).

The ALJ then asked the VE to imagine a hypothetical individual of Albright's age, education, and work experience who could perform work that involves no exposure to hazards and no commercial driving.  (Tr. 82).  The work is repetitive and consistent, but not necessarily simple.  (*Id.*).  In this case, the work is low stress (i.e., not inflexible or fast-paced), but not routine and predictable; there are frequent changes in the work to be performed or the work setting.  (*Id.*).  The VE testified that this person could perform the same jobs he listed above in the previous hypothetical.  (Tr. 82-83).

The VE also testified that the second hypothetical claimant being off task for twenty percent of the workday would be job preclusive.  (Tr. 83).  The VE explained, however, that if the claimant could compensate for being off task for twenty percent of the day by working faster, then this would be "tolerable."  (Tr. 83-84).  Meanwhile, if the person is completely off task and not being productive, then ten percent is the limit.  (Tr. 84).  Furthermore, the VE testified that if this second hypothetical claimant missed two days of work a month due to psychological or psychiatric reasons, that would generally be work preclusive.  (*Id.*).

### D.    The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Albright engaged in substantial gainful activity from August 2012 through September 2012, but that he did not engage in substantial gainful activity for a continuous twelve-month period beginning on

October 1, 2012.  (Tr. 14).  Next, the ALJ found that Albright has the severe impairments of affective disorder, psychosis, and substance abuse.  (*Id.*).  At Step Three, the ALJ found that Albright's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 16).

The ALJ then found that Albright retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations:  at his best, he is able to perform work that does not involve commercial driving or exposure to hazards, such as unprotected heights or uncovered industrial machinery.  (Tr. 18). He is able to perform work that involves consistent and repetitive tasks that are not necessarily simple.  (*Id.*).  The work he can perform is low stress, defined as work that does not involve an inflexible or fast pace.  (*Id.*).  The work should not be routine and predictable, defined as involving frequent changes.  (*Id.*).

At Step Four, the ALJ concluded that Albright has no past relevant work.  (Tr. 29).  At Step Five, the ALJ found that considering Albright's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy: cleaner/housekeeper, packager, and clerical assistant.  (Tr. 30).  As a result, the ALJ concluded that Albright is not disabled under the Act.  (Tr. 31).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d

591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter

differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F.    Analysis**

In his summary judgment motion, Albright argues:  (1) the ALJ's consideration of his father's[2] statements was inconsistent with Social Security Ruling ("SSR") 06-03p; (2) the ALJ's failure to mention two records from the U.S. Department of Veterans Affairs ("VA") merits remand; (3) the ALJ violated the treating physician rule as to the opinions of Mark Deskovitz, Ph.D., ABPP; Richard L. Weiss, Ph.D., L.P.C.; Mark Highsmith, Ph.D.; and Kenny W. Bertram, Ph.D.; (4) the ALJ erred in failing to obtain updated evidence, such as a consultative examination or a medical source statement; and (5) the ALJ's analysis of the VE's testimony was flawed.

*1.    The ALJ Properly Considered Albright's Father's Statements*

Albright first challenges the ALJ's evaluation of his father's written statements.  Albright claims that the ALJ gave them "'little weight' with no further development," and that this was not in line with SSR 06-03p because the ALJ "failed to provide a proper rationale as to why she

---

[2] While this argument's heading references statements provided by both Albright's father and mother, the text of Albright's argument does not mention his mother's statements.  (Doc. #9 at 9).  In his reply, Albright addresses his mother's testimony in a single paragraph, with a one-sentence argument that is unsupported by any form of authority:  "It is not uncommon for bi-polar patients such as [Albright] to give different responses at different times due to the cyclical nature of the mental disease depending if [Albright] was in a manic or depressive stage."  (Doc. #14 at 4).  Given this lack of developed argumentation, Albright's challenge to the ALJ's treatment of his mother's statements is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotations omitted).

discounted them." (Doc. #9 at 10-11). Albright argues that "[a] proper evaluation would have been better made . . . [had it] included [his father's] observations throughout the period of claimed disability" – specifically, by allowing his father to testify at the hearing. (*Id.*). Albright asserts that "[o]nce [the ALJ] decided to accord little weight to the written statements provided by [Albright's father] and to not accept additional testimony from [him,] [the ALJ] should have asked for or developed third-party statements from other individuals." (*Id.* at 9). Albright argues that this greatly disadvantaged him and warrants remand. (*Id.* at 10). The Court disagrees.

SSR 06-03p relates to the weight an ALJ may give to "Other Evidence from Sources Who Are Not 'Acceptable Medical Sources,'" including parents. SSR 06-03p, 2006 WL 2329939, at *2-4, 6 (Aug. 9, 2006). Under SSR 06-03p, parents are considered "non-medical sources," and their opinions "cannot establish the existence of a medically determinable impairment" but "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*; *see* 20 C.F.R. §§ 404.1513(a)(4), 416.913(a)(4). SSR 06-03p provides that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 6, 2006).

Here, the ALJ's discussion of Albright's father's statements satisfies SSR 06-03p. The ALJ considered a statement submitted by Albright's father on April 1, 2013, where he asserted that Albright had a "difficult time" finding the motivation to keep medical appointments in the late summer and fall of 2012. (Tr. 28). The ALJ noted that Albright's father indicated that he

9

and Albright's mother sometimes took away Albright's driving privileges due to his failure to follow through with medical care or to take his medication consistently. (*Id.*). Albright's father also indicated that they had to remind Albright to maintain his hygiene and that Albright would stay up late writing in his journal for hours and then sleep for days. (*Id.*). After considering this, the ALJ wrote that she "accept[s] [Albright's father's] observations as his opinion of [Albright's] ability to function in late 2012 through early 2013." (*Id.*).

But the ALJ "accord[ed] little weight to [Albright's father's] opinions for the purposes of determining [Albright's] long-term ability to function." (*Id.*). Consistent with SSR 06-03p, she explained that Albright's own report that he was able to play poker and use Facebook "24/7" indicates an ability to function above the limits suggested by his father. (*Id.*). In addition, she determined that Albright's father's July 3, 2011 statement that Albright was acting bizarrely referenced Albright's *temporary* episode of decompensation before he was hospitalized, when he was abusing his medications. (*Id.*). As Albright himself points out, evidence provided by "non-medical sources" must be considered. (Doc. #9 at 10); *see* SSR 06-03p, 2006 WL 2329939, at *3-4 (Aug. 6, 2006). Here, the ALJ did exactly that. And contrary to Albright's allegation, the ALJ went beyond just considering the evidence; she properly explained the weight given to it in such a way that "allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 6, 2006). Thus, this portion of the ALJ's decision is not at odds with SSR 06-03p.

Albright's argument that the ALJ should have accepted additional testimony from his father or asked for third-party statements from other individuals also fails. Albright cites to no authority that shows that the ALJ's failure to do either one of these things constitutes error. Furthermore, Albright contends that the ALJ did not grant Albright's father's request to testify at

the hearing and that if he had been allowed to testify, he "would have said that playing internet poker and using Facebook 24/7 was an obsession" for Albright when he made those statements that the ALJ eventually relied on.  (Doc. #9 at 9-11); (Tr. 28).  But as the Commissioner points out (Doc. #12 at 9-11), the hearing transcript makes clear that the ALJ did not deny Albright's father the opportunity to testify:

> ATTY:  . . . [Albright's father is] here, . . . who I thought about taking some testimony from if you thought it was necessary.  He's got plenty of commentary already in the record.
>
> ALJ:  Yes, he does.
>
> ATTY:  So what you're saying is we don't need him?
>
> ALJ:  Not to my knowledge.  I mean if there's something that [Albright's father] can add to this, that's different.
>
> ATTY:  There's nothing really he can add that he hasn't already indicated or that [Albright] hasn't talked about.  He would just expand up on the fact that [Albright] has obvious[] issues controlling money and making wise decisions.
>
> ALJ:  I think that's clear.
>
> ATTY:  Okay.  I wanted to make it available, Your Honor.
>
> ALJ:  Thank you.  Anything else?
>
> ATTY:  No, thank you.

(Tr. 84-85).

Far from denying Albright's father the chance to testify, the ALJ indicated a willingness to hear from his father if Albright's attorney believed his testimony would add "something" to the record.  (Tr. 85).  It was Albright's attorney who then stated, "[t]here's nothing really he can add" other than to expand on the "obvious[] issues controlling money making wise decisions." (*Id.*).  The hearing proceeded with no objection being lodged.  Because Albright has not

demonstrated that the ALJ abused her discretion, remand is not warranted.  Moreover, Albright has not made a sufficient showing that the ALJ should have asked for or developed third-party statements from other individuals.  (*See* Doc. #9 at 10).  For instance, he does not identify who should have been contacted, for what purpose, what information that person would have provided, and what legal authority requires that such steps be taken by the ALJ.  Thus, the ALJ committed no error as to this issue.

### 2.      The ALJ did not Err in her Analysis of the VA's Records

Albright argues that the ALJ's failure to explicitly mention two VA records contained within Exhibit 24E – (1) a November 5, 2014 letter from the VA noting that Albright's combined service-connected disability was 100%; and (2) an August 1, 2014 record by Camille E. Kempke, M.D., VA Staff Psychiatrist, in which she opined that Albright has "[t]otal occupational and social impairment" – merits remand.  (Doc. #9 at 12-14); (Tr. 512-13, 520-22). The Court disagrees.

The ALJ reviewed Albright's VA records and noted that a February 14, 2013 decision found him 50% service-connected disabled for bipolar disorder with psychotic features and cannabis abuse, to be effective as of September 14, 2011.  (Tr. 25).  The ALJ also considered that the VA subsequently found Albright incompetent to handle his own financial affairs and appointed a fiduciary.  (*Id.*) (citing Exhibit 24E at 6, 9 on Tr. 514, 517).  Ultimately, the ALJ gave the VA disability determination partial weight because the VA "is a separate agency with its own rules for determining disability" and the evidence before her did not show that his impairments preclude all work.  (*Id.*).  For example, there was evidence that Albright engaged in full-time substantial gainful activity during part of 2012, and medical records demonstrate that he improves with treatment.  (*Id.*).  Albright worked forty hours a week at Verizon from June to

12

September 2012 as a sales representative, and "never missed a day."  (Tr. 49, 73).  On some

days, he would see up to eleven customers and said he "enjoyed [this] job more than any other

job [he] had."  (Tr. 51).  He was also taking classes at Kirtland Community College, but stopped

when he tried to start a business.  (Tr. 58-59).  During this time, he was taking his medications as

prescribed.  (Tr. 76).  He testified at the hearing that he sometimes looks for work and that he

was looking for a part-time job because he also wanted to go back to school at the same time.

(Tr. 71-73).  He hopes to use his degree to do some kind of social work.  (Tr. 73).  He stated that

his current job search is limited because of his own lack of motivation; he explained that he has

had many different jobs but "only found motivation at one of them," namely, the Verizon job

and "really do[esn't] want to work in fast food or restaurant or hard labor."  (Tr. 75-76).

Although the ALJ did not specifically discuss the two records in question, as explained

above, there is no requirement that the ALJ discuss every piece of evidence in the administrative

record.  *See Kornecky*, 167 F. App'x at 508.  Moreover, even though the ALJ did not explicitly

discuss these documents, it appears she did, in fact, consider them.  As the Commissioner notes,

the ALJ mentioned Exhibit 24E in her decision and said that she "reviewed and admitted this

new evidence and incorporated it into this decision."  (Tr. 11).  The Court finds no reason to

think otherwise and concludes that the ALJ's consideration of the VA records was sufficient.

Furthermore, the Sixth Circuit has held that "a disability rating from the Veterans

Administration is entitled to consideration, but we have not specified the weight such a

determination should carry when determining social security disability eligibility."  *Ritchie v.

Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th Cir. 2013) (citing *Stewart v. Heckler*, 730 F.2d

1065, 1068 (6th Cir. 1984))[3]; *see also* SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 6, 2006)

[3] Albright cites to *Olson v. Schweiker*, 663 F.2d 593, 597 n.4 (5th Cir. 1981) (citing *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. 1981)), for the proposition that "[a]lthough the V.A.'s disability rating is not binding on the [Commissioner], it is evidence that should be given great

13

("[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.").  Yet Social Security regulations make clear that

> a decision by any other governmental agency or a nongovernmental entity [such as the Department of Veterans Affairs] about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules.

20 C.F.R. §§ 404.1504, 416.904; *see also* SSR 06-03p, 2006 WL 2329939, at *6-7 (Aug. 6, 2006) ("Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies," such as the Department of Veterans Affairs.).  As a result, even if the ALJ had summarized the two records at issue, she was in no way bound by them.  Moreover, Albright has not shown how the ALJ discussing these records would have altered her decision and that her failure to do so is error requiring remand.  In sum, the ALJ appropriately considered these records, which is all she was required to do.

### 3.     The ALJ did not Violate the Treating Physician Rule

Albright argues that "[t]here are at least 13 times that [the ALJ] gave 'little weight' to medical evidence that [he] submit[s] was without proper analysis."  (Doc. #9 at 14).  But in the table he provides to illustrate this point, he is apparently counting documents authored by his father, mother, a social worker, and the VA – none of which is "medical evidence."  (*Id.*).  As to the actual medical evidence that appears on this list, Albright only elaborates on the opinions of four providers:  Dr. Deskovitz, Dr. Weiss, Dr. Highsmith, and Dr. Bertram.  The Court will therefore address Albright's arguments – which seem to be based on an alleged violation of the "treating physician rule" – with respect to these four medical opinions.

---

weight."  (Docs. #9 at 12-13; #14 at 8).  But this case is at odds with the Sixth Circuit precedent referenced above, which is the binding authority in this district.

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)). Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). Accordingly, "the Sixth Circuit has held that '[a]n [ALJ] may give more weight to the opinions of examining or consultative sources where the treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014)), *report and recommendation adopted*, 2016 WL 1357900, at *6 (E.D. Mich. Apr. 5, 2016).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for the weight given to a treating source opinion)). "Although the

regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).  Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242).  That a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving controlling weight to it. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

### a.  Dr. Deskovitz's Opinion

On February 20, 2013, Dr. Deskovitz filled out a medical statement regarding Albright's mental abilities and aptitudes needed to do work-related activities for three different categories: (1) unskilled work, (2) semiskilled and skilled work, and (3) particular types of jobs.  (Tr. 883-84).

As for skilled work, Dr. Deskovitz indicated that Albright's ability to understand, remember, and carry out very short and simple instructions was unlimited or very good.  (Tr. 883).  He opined that Albright's ability to remember work-like procedures, maintain attention for a two-hour segment, make simple work-related decisions, and ask simple questions or request assistance was "limited but satisfactory," which means that he has "noticeable difficulty (e.g., distracted from job activity) no more than 10 percent of the workday or work week."  (*Id.*).  Dr. Deskovitz further opined that Albright's ability to sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically-based

16

symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions was "seriously limited," meaning he has "noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or work week." (*Id.*).  In addition, Dr. Deskovitz opined that when it came to Albright's ability to maintain regular attendance and be punctual within customary (usually strict) tolerances, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with normal work stress, Albright was "unable to meet competitive standards," which means that he has "noticeable difficulty (e.g. distracted from job activity) from 21 to 40 percent of the workday or work week." (*Id.*).

In terms of semiskilled and skilled work, Dr. Deskovitz found Albright's ability to set realistic goals or make plans independently of others and to understand, remember, and carry out detailed instructions was seriously limited.  (Tr. 884).  He also found that Albright's ability to deal with stress of semiskilled and skilled work could not meet competitive standards.  (*Id.*).

With respect to particular types of jobs, Dr. Deskovitz indicated that Albright's ability to travel in an unfamiliar place and to adhere to basic standards of neatness and cleanliness were seriously limited.  (*Id.*).  Meanwhile, he indicated that Albright's ability to interact appropriately with the general public, maintain socially appropriate behavior, and use public transportation was insufficient to meet competitive standards.  (*Id.*).

Dr. Deskovitz then explained his findings regarding Albright's limitations in working a regular job on a sustained basis as follows:  "He appears to have a schizophrenia spectrum disorder that inhibits him from functioning for extended periods of time.  He can maintain work

17

for a brief time until his symptoms become exacerbated under stress." (*Id.*). Towards the end of this form, Dr. Deskovitz checked a box indicating that, on average, Albright's impairments or treatment would cause him to be absent from work more than four days per month. (*Id.*). He also checked a box indicating that Albright cannot manage his benefits in his own best interest, with the following handwritten note below: "Not when he is psychotic as he spends his money quickly [and] cannot pay his bills." (*Id.*).

> The ALJ specifically considered Dr. Deskovitz's opinion, evaluating it as follows:
>
>> I accord little weight to this opinion because it is inconsistent with the record as a whole. This opinion is inconsistent with his treatment notes showing general improvement. . . . In September 2012, Mr. Albright lost his job as a sales representative for Verizon where he worked full time. He testified that he did not miss any work and had no problems interacting with others. He also reported that he was able to use public transportation and go out alone. . . . This is inconsistent with Dr. Deskovitz's opinion. Therefore, I accord this opinion little weight.

(Tr. 26).

Albright takes issue with the ALJ's decision to give Dr. Deskovitz's opinion little weight based on the conclusion that "it was inconsistent with the record as a whole." (Doc. #9 at 16-17). He believes that Dr. Deskovitz's opinion is "controlling and lead[s] to a conclusion that [Albright] is unable to sustain employment." (Doc. #14 at 5). The crux of Albright's claim appears to be that the ALJ "cherry picked" the record and that the ALJ did not give "good reasons" for giving Dr. Deskovitz's opinion little weight. (Doc. #9 at 16-17, 20-21). These arguments lack merit.

Albright cites to *Scott v. Astrue*, 647 F.3d 734 (7th Cir. 2011), in support of his "cherry picking" argument: "an ALJ may not pick and choose certain parts of the medical opinion to support a decision." (Doc. #9 at 17). In his view, the ALJ "was too quick to read inconsistencies into the statements of [Dr. Deskovitz]" and "it is not inconsistent for a patient to

18

respond to treatment yet be markedly limited in one's ability to work." (*Id.*). Albright argues that both he and the claimant in *Scott* "had some improvement with treatment, [but] they both continued to experience psychological difficulties." (*Id.*). In his motion, Albright does not elaborate on what these psychological difficulties are or where in the record the ALJ should have looked to consider them.

"It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'" *Gordon v. Comm'r of Soc. Sec.*, No. 14-11990, 2015 WL 5335477, at *14 (E.D. Mich. Aug. 12, 2015) (quoting *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio Mar. 11, 2013)). But "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Id.* (quoting *Solembrino v. Astrue*, No. 1:10-CV-01017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011); citing *Smith*, 2013 WL 943874, at *6 and *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)). "[I]t is not uncommon in disability cases for there to be some inconsistencies in the record," and it is the ALJ's duty "to resolve any inconsistencies in the evidence." *Id.* The Court cannot conduct a *de novo* review of the record evidence, and an ALJ's findings are "not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Id.* (citing *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001)); *Cosma v. Comm'r of Soc. Sec.*, No. 14-11787, 2015 WL 5693664, at *3 (E.D. Mich. Sept. 29, 2015) ("Indeed, courts have recognized that allegations of cherry picking are seldom successful because they call for the court to re-weigh the evidence." (citing *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 725 (6th Cir. 2014))). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Gordon*, 2015 WL 5335477, at

*14 (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  In weighing the evidence, an

ALJ "should consider the record as a whole" and is "not required to discuss every medical record

in detail." *Jones v. Astrue*, No. 1:11-cv-228, 2012 WL 2133592, at *9 (S.D. Ohio June 12,

2012).

Here, the ALJ properly considered Dr. Deskovitz's opinion when she weighed it with the

evidence in the record, beginning with Dr. Deskovitz's own treatment notes.  The ALJ noted that

on June 30, 2011, Albright reported to Dr. Deskovitz that he experienced an increase in racing

thoughts, not sleeping for several nights, abusing substances, and alienating people around him.

(Tr. 20).  The ALJ considered that a few days later, Albright's father petitioned the courts that

Albright be involuntarily admitted for psychiatric treatment.  (*Id.*).  But she pointed out that by

August 4, 2011, Albright was reporting an improved mood and improved ability to handle stress.

(Tr. 21).  On August 18, 2011, however, Albright told Dr. Deskovitz that he was feeling worse

because of stress and wanted to quit his medication.  (*Id.*).  The ALJ noted that Dr. Deskovitz,

who observed Albright to be having trouble concentrating and appeared to be delusional,

recommended Albright begin more intensive services from a provider called "CMH."  (*Id.*).  The

ALJ considered that a couple of weeks later, on August 31, 2011, Dr. Deskovitz recorded that

Albright had not been taking his medication and was therefore feeling fearful and hearing voices.

(*Id.*).  The ALJ also considered that on February 17, 2012, Albright told Dr. Deskovitz that his

mood was good, he was not getting confused anymore, and his classes were going well:  he was

keeping busy with homework and communicating with other students.  (*Id.*).  On March 1, 2012,

Albright was doing "great" and working at Taco Bell.  (*Id.*).  The ALJ noted that following an

April 2012 episode of confusion and paranoid thinking that required Albright to pull over while

driving, he again reported improvement to Dr. Deskovitz.  (Tr. 21-22).  Furthermore, on July 26,

2012, Albright told Dr. Deskovitz that he was "doing very good because he had been working at Verizon and doing very well there." (Tr. 22). The ALJ mentioned that on February 18, 2013, Albright reported to Dr. Deskovitz that he had been writing his thoughts down "a lot" to help him deal with increased confusion. (*Id.*). She also mentioned that shortly thereafter, on March 4, 2013, Albright reported "feeling great" because he was awarded VA disability benefits. (*Id.*). The ALJ's reference to these records not only demonstrates that she did not "cherry pick" the record, but it also supports her conclusion to give Dr. Deskovitz's February 20, 2013 opinion little weight.

Additional evidence in the record also supports the ALJ's treatment of Dr. Deskovitz's opinion. On numerous occasions, Albright indeed reported to Dr. Deskovitz that he was having "good days" or feeling "better" or "well." (Tr. 698, 704, 872, 874-77, 882). The record also indicates that, as the ALJ points out, Albright reported no difficulties interacting with others even though Dr. Deskovitz opined that Albright's abilities to interact appropriately with the general public, maintain socially appropriate behavior, and get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes are insufficient to meet competitive standards. (Tr. 883-84). On August 18, 2011, Albright told Dr. Deskovitz that he had seen his friends over the last few weeks and is closer to his friends than his family. (Tr. 704). During the hearing, he testified that he got along with his brother's three children, who he babysat. (Tr. 57). He also testified that he socializes with friends "once in a while" on the weekends (Tr. 63), but he sometimes gets together with a larger group of friends once a month. (Tr. 71). Once every couple of weeks, he goes to bars or clubs. (Tr. 68). He testified that he "do[es]n't like doing anything by [him]self" and that he "ha[s] problems doing things by himself." (Tr. 71). He stated that his contact with the public at the Verizon job "was ok . . .

there was no bad or good about it." (Tr. 78). Albright's Function Report also reflects that he spends time with friends and has no problems interacting with others. (Tr. 379-81).

As for his ability to work, the record supports the ALJ's conclusion that Albright's testimony is at odds with Dr. Deskovitz's opinion. Dr. Deskovitz opined that Albright's ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms was seriously limited, his ability to maintain regular attendance and be punctual was unable to meet competitive standards, and he would miss more than four days per month due to his impairments or treatment. (Tr. 883-84). But Albright testified that he worked eight-hour days at Verizon, "never missed a day of work," and "had a smile on his face." (Tr. 73, 76). Albright testified that he was, at that time, looking for part-time work. (Tr. 73). When the ALJ inquired as to why he was only looking for part-time work, Albright explained that in addition to working part time, he wanted to go back to school. (*Id.*). In his reply, Albright highlights his testimony that "he was not able to keep up with his outreach and relationships after a sale" at the Verizon job. (Doc. #14 at 5). Yet when asked by the ALJ to explain why, he said that it wasn't because he wasn't capable of it; rather, he was more focused on the selling and "just didn't see [the outreach] as being as important as the other things that [he] did around the office." (Tr. 52).

Furthermore, the ALJ noted that while Dr. Deskovitz opined that Albright's ability to use public transportation would not meet competitive standards (Tr. 884), Albright indicated otherwise in his Function Report; specifically, he indicated that he uses public transportation. (Tr. 379). In addition, even though Dr. Deskovitz determined that Albright's ability to deal with normal work stress and stress of semiskilled and unskilled work is unable to meet competitive standards (Tr. 883-84), Albright wrote in his Function Report that he "work[s] well under a lot

22

[of stress] but burn[s][]out when there is nothing to do."  (Tr. 381).  Finally, Dr. Deskovitz found

that Albright's ability to adhere to basic standards of neatness and cleanliness is seriously

limited.  (Tr. 884).  However, multiple providers described Albright's appearance, grooming, or

hygiene as "clean," "good," "normal," or "appropriate."  (*See, e.g.*, Tr. 521-22, 616, 622, 625,

628, 667, 669, 674, 679, 743, 753, 784-88, 1114-15, 1127, 1188, 1211, 1490, 1499, 1505, 1512).

As mentioned above, that a treating physician's opinion is inconsistent with the record

constitutes a "good reason" for not giving it controlling weight.  *Reynolds*, 424 F. App'x at 417-

18.  Accordingly, the ALJ properly considered Dr. Deskovitz' February 20, 2013 opinion and

provided a "good reason" for giving it little weight.  Substantial evidence supports the ALJ's

decision, and Albright's argument as to Dr. Deskovitz's opinion lacks merit.

### b.  Dr. Weiss' Opinion

Dr. Weiss conducted a clinical neuropsychological examination of Albright on multiple

dates in February and March 2013.  (Tr. 838).  The results from this examination, dated March

12, 2013 (*id.*) contain this recommendation for Albright's "Vocational Implications":

> Mr. Albright is incapable of engaging in regular, competitive employment
> in a competitive work environment.  Paranoid-like thought processes will
> significantly influence his relationships with supervisors, co-workers, and
> the general public.   Additionally, symptoms associated with bipolar
> disorder will preclude consistent persistence and pace and result in
> episodes of deterioration in the work place.

(Tr. 858-59).  The ALJ explicitly evaluated this opinion as follows:

> I accord little weight to Dr. Weiss's opinion because he only saw Mr.
> Albright one time and because his opinion is inconsistent with the record.
> Mr. Albright is able to sustain full-time competitive employment as is
> evidenced by his actually doing so during the summer of 2012.  He
> routinely reported significant involvement in social activities.  He even
> provided childcare in 2011 and 2014.

(Tr. 26).

Albright recounted Dr. Weiss' statements, and made the following one-sentence argument: "It is submitted that the opinion of Dr. Weiss is consistent with the record as a whole that the Claimant Albright is disabled from substantial gainful activity." (Doc. #9 at 18). The Sixth Circuit has "consistently held that . . . arguments adverted to in only a perfunctory manner, are waived." *Brewer v. Comm'r of Soc. Sec.*, No. 13-14409, 2014 WL 6632176, at *13 (E.D. Mich. Nov. 21, 2014) (collecting cases). "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *Greene v. Comm'r of Soc. Sec.*, No. 2:14-CV-10005-DPH-PTM, 2014 WL 12570932, at *10 (E.D. Mich. Nov. 26, 2014), *report and recommendation adopted*, No. 14-10005, 2014 WL 12573828 (E.D. Mich. Dec. 31, 2014) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)). Albright's barebones argument as to Dr. Weiss' opinion is therefore waived.

### c.   Dr. Highsmith's Opinion

On October 26, 2012, Dr. Highsmith characterized Albright's level of occupational and social impairment with regard to all of his mental diagnoses as "[o]ccupational and social impairment with reduced reliability and productivity." (Tr. 1036-37). Upon reviewing this opinion, the ALJ concluded:

> The record does show that Mr. Albright's mental disorders cause some limitations in his ability to perform basic work activity. However, Dr. Highsmith only evaluated Mr. Albright one time and did not provide any explanation as to Mr. Albright's specific functional capabilities. Therefore, I accord this opinion little weight.

(Tr. 26).

Albright again presents his entire argument in just one sentence: "It is submitted that the opinion of Dr. Highsmith is consistent with the record as a whole that the Claimant Albright is disabled from substantial gainful activity." (Doc. #9 at 18-19). For the same reasons that

Albright's argument as to Dr. Weiss is waived, so too is his argument waived as to Dr. Highsmith. *Brewer*, 2014 WL 6632176, at *13; *Greene*, 2014 WL 12570932, at *10; *McPherson*, 125 F.3d at 995-96.

### d. Dr. Bertram's Opinion

On October 22, 2014, Dr. Bertram wrote: "It appears clear that [Albright] is at least as likely as not unemployable in any substantially gainful employment." (Tr. 1374). The ALJ analyzed this opinion as follows:

> Dr. Bertram was not Mr. Albright's treating physician and evaluated him only once. At that evaluation, Dr. Bertram noted Mr. Albright was very quiet. . . . Therefore, it appears that Dr. Bertram obtained most of his information from Mr. Albright's father, who was present. . . . I note that [Kimberly Gourlay, LMSW] had recently indicated Mr. Albright's father was a previous employee of Social Security and appeared "insistent" that Mr. Albright receive disability. . . . Therefore, I do not accord much weight to an opinion based on the father's self-report. Moreover, Mr. Bertram's opinion is based on VA standards. The standard "least as likely as not unemployable" is not a standard used by this Agency. Nor does it provide any functional analysis with which to demonstrate Mr. Albright's actual abilities. Therefore, I accord this opinion little weight.

(Tr. 27).

Albright argues that remand is appropriate based on a Ninth Circuit case, *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). (Doc. #9 at 19). Specifically, Albright cites to a three-prong standard that appears in *Garrison* for applying the Ninth Circuit's "credit-as-true

rule," which has to do with the scope of judicial power to remand for an award of benefits.[4]

*Garrison*, 759 F.3d at 1019.  The Ninth Circuit explained in *Garrison* that it has

> devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits:  (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020; (*see* Doc. #9 at 19).

Albright's position is that "the three conditions set out in *Garrison* have been met." (Doc. #9 at 19).  He claims that he has "noted at least 13 times where the ALJ gave 'little weight' to evidence without legally sufficient reasons for rejecting the evidence" and that "[t]he record has been fully developed with numerous treating physician opinions that . . . Albright is unable to be gainfully employed."  (*Id.*).  In making this argument, he again points to the VA's "finding that [Albright] was 100% service related disabled," which he argues "should be given great weight."  (*Id.* at 19).  But at no point does Albright specifically address Dr. Bertram's opinion or apply the Ninth's Circuit's *Garrison* standard to it.  Moreover, Albright gives no explanation as to why his case, which was filed in the Eastern District of Michigan within the Sixth Circuit, should be bound by Ninth Circuit precedent.  Given Albright's failure to discuss

---

[4] The Ninth Circuit's "credit-as-true rule" is explained as follows:

> If the ALJ fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, the Ninth Circuit credits the opinion as a matter of law.  In other words, improperly rejected treating physician testimony is credited as true as a matter of law.  The Ninth Circuit's "credit-as-true rule applies to medical opinion evidence, not only claimant testimony."

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law & Procedure in Federal Court § 2:39, at 181-82 (Thompson Reuters, 2017 ed. 2017) (internal quotation omitted).

why the ALJ's analysis of Dr. Bertram's opinion was mishandled,[5] this argument is waived for

the same reasons Albright's arguments as to Dr. Weiss and Dr. Highsmith are waived. *Brewer*,

2014 WL 6632176, at *13; *Greene*, 2014 WL 12570932, at *10; *McPherson*, 125 F.3d at 995-

96.

4. *The ALJ did not Err in Failing to Obtain Updated Evidence, such as a Consultative Examination or a Medical Source Statement*

Albright argues that even though the Appeals Council directed the ALJ "to obtain

updated evidence concerning [his] impairments which may include a consultative examination

and medical source statements about what [he] can still do despite the impairment," the ALJ did

neither. (Doc. #9 at 20) (citing Tr. 143). Albright believes that this entitles him to a reversal or

remand of his case. (*Id.*). The Court disagrees.

To begin with, in making this argument, Albright cites entirely to *Blakley v. Comm'r of

Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) and the treating physician rule; but without any further

explanation from Albright, those authorities have no relevance to the instant issue. (Doc. #9 at

20-21). After discussing the treating physician rule, Albright concludes by stating that the ALJ

_____

[5] In his reply, Albright elaborates slightly on the ALJ's handling of Dr. Bertram's opinion. He argues that the ALJ not "accord[ing] much weight to [Dr. Bertram's] opinion [because it was] based on [Albright's] father's self-report" (Tr. 27) "shows more bias toward [Albright's] father with this comment." (Doc. #14 at 6). He also argues that "Dr. Bertram is simply another independent physician who examined [Albright] and whose opinion that [he] cannot work is consistent with the opinions of Dr. Deskovitz, Dr. Weiss, Dr. Highsmith and the record." (*Id.*). But these arguments are unavailing. They point to no portions of the record or any relevant case law that show the ALJ has erred in such a way that merits remanding the case. Moreover, a physician's statement that a claimant is unable to work is "entitled to no deference because the determination of disability is a matter left to the Commissioner." *See Stojic v. Comm'r of Soc. Sec.*, No. 14-1133, 2015 WL 9238986, at *4 (W.D. Mich. Dec. 17, 2015) (citing 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled.")); *Bass*, 499 F.3d at 511 (internal citations omitted) ("20 C.F.R. § 404.1527(e)(1) explicitly states that the conclusion of disability is reserved to the [Commissioner]," and "[s]ubsection (e)(3) further elaborates that no 'special significance' will be given to opinions of disability, even if they come from a treating physician."); SSR 96-5p, 1996 WL 374183 (July 2, 1996).

"did not give 'good reasons' for giving []little weight to the treating medical source opinions nor did [the ALJ] give any reasons for not ordering a Consultative Exam or Medical Source Statement." (*Id.* at 21).  In his reply, Albright attempts to clarify the connection between the treating physician rule and ordering updated evidence with the following bare assertion, unsupported by any legal authority:  "Plaintiff submits that when an ALJ gives limited weight to multiple treating medical sources that the ALJ is required in the exercise of reasonable discretion to order a consultative examination or request medical source statements." (Doc. #14 at 8). Also in his reply, Albright states that the ALJ's treatment of Dr. Highsmith's opinion "is a perfect example [of] how the ALJ did not follow the instructions of the Appeals Council as the ALJ could have obtained updated evidence from Dr. Highsmith himself through a medical source statement or through a consultative examination." (*Id.* at 6).  Thus, Albright again makes conclusory, undeveloped, and unsupported statements in his request for relief, which the Court finds to have no merit.  For the reasons explained above in the previous section, the ALJ did not violate the treating physician rule.  And for the reasons explained below, the ALJ did not err in not obtaining a consultative exam or medical source statement.

As for Albright's contention that the ALJ should have obtained a consultative examination, the Appeals Councils' order explicitly says that updated evidence should be ordered "in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 C.F.R. [§§] 404.1512-1513 and 416.912-913)" and "*may include, if warranted and available*, a consultative examination and medical source statements about what the claimant can still do despite the impairment." (Tr. 143) (emphasis added).  The order specifically references 20 C.F.R. §§ 404.1512 and 416.912, which provide that "[w]e *may* ask [the claimant] to attend one or more consultative examinations at our expense." (*Id.*); 20 C.F.R.

§§ 404.1512, 416.912 (emphasis added).   Furthermore, the rules governing the consultative examination process provide that an ALJ "*may* purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim."  20 C.F.R. §§ 404.1519a(b), 416.919a(b) (emphasis added); *see also* 20 C.F.R. §§ 404.1520b(b)(2)(iii), 416.920b(2)(iii) ("We *may* ask you to undergo a consultative examination at our expense" to resolve an inconsistency or insufficiency in the evidence. (emphasis added)).   Here, in light of the detailed, reasoned analysis contained in the ALJ's decision, substantial evidence supports her decision that a consultative examination would not be helpful in resolving an inconsistency or an insufficiency in the evidence.  *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. Moreover, . . . the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." (citing 20 C.F.R. §§ 416.912, 416.913(d), 416.917(a))).

Finally, as for Albright's argument that the ALJ should have contacted Dr. Highsmith or obtained a medical source statement, the discretionary language that appears in the Appeals Council's order also applies to obtaining a medical source statement. (Tr. 143).  In addition, the regulations provide:

> If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency.   The action(s) we take will depend on the nature of the inconsistency or insufficiency.  We will try to resolve the inconsistency or

insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

(i)     We *may* recontact your medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. . . .

20 C.F.R. §§ 404.1520b(b)(2), 416.920b(b)(2) (emphasis added). Thus, like the Appeals Council's order, the applicable regulations did not *require* the ALJ to re-contact Dr. Highsmith or any of Albright's physicians; they merely afforded the ALJ this option if she deemed it necessary. Here, Albright fails to identify what physicians, other than Dr. Highsmith, should have been re-contacted and what purpose this would have served.

In sum, the ALJ properly considered the evidence that was before her and did not find it necessary to obtain a consultative examination or medical source statement to resolve inconsistencies or insufficiencies in the record. The decision to not obtain updated evidence was within the ALJ's discretion, and Albright has not shown any abuse of that discretion by the ALJ. The Court finds no error as to this issue.

### 1.     The ALJ's Analysis of the VE's Testimony was not Flawed

At Step Five, the ALJ relied on the VE's testimony that an individual with Albright's age, education, work experience, and RFC could perform jobs such as cleaner/housekeeper (DOT number 323.687-014), packager (DOT number 320.587-018), and clerical assistant (DOT number 239.567-010). (Tr. 30). The ALJ then wrote: "Pursuant to SSR 00-4p, I have determined that the [VE's] testimony is consistent with the information contained in the [DOT] and its companion volume, *Selected Characteristics of Occupations* ["SCO"]." (*Id.*). Albright faults the ALJ because she "offered no analysis and offered no documentation supporting her

conclusion," and in Albright's view, "[j]ust saying something doesn't make it true." (Doc. #9 at

21). Albright points to the Appeals Council's instructions, which directed the ALJ to

> [o]btain evidence from a [VE] to clarify the effect of the assessed
> limitations on the claimant's occupational base . . . . Further, before
> relying on the [VE] evidence the [ALJ] will identify and resolve any
> conflicts between the occupational evidence provided by the [VE] and
> information in the [DOT] and its companion publication, the [SCO].

(Tr. 143) (citing SSR 00-4p); (Doc. #9 at 21). Albright contends that the ALJ did not analyze

the VE's statements in accordance with the Appeals Council's instructions. (Doc. #9 at 21).

SSR 00-4p provides, in relevant part:

> When a VE or VS [vocational specialist] provides evidence about the
> requirements of a job or occupation, the adjudicator has an affirmative
> responsibility to ask about any possible conflict between that VE or VS
> evidence and information provided in the DOT. In these situations, the
> adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with
> information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the
> adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000). In other words, "[i]n an effort to insure

that such actual or apparent conflicts are addressed, the Social Security Administration has

imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided

'conflicts with [the] information provided in the DOT.'" *Lindsley v. Comm'r of Soc. Sec.*, 560

F.3d 601, 603 (6th Cir. 2009) (citing SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000)). "In

the Sixth Circuit, the ALJ's duty is satisfied if he or she asks the VE whether his or her

testimony is consistent with the DOT." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 508

(6th Cir. 2013) (citing *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006)).

"ALJs must also 'obtain a reasonable explanation for . . . apparent conflict[s]' if the VE's

evidence 'appears to conflict with the DOT.'" *Lindsley*, 560 F.3d at 603 (internal citations

omitted).

In this case, the Commissioner concedes that "the ALJ did not specifically ask the VE at the hearing whether there was an inconsistency between his testimony and the occupational information supplied in the DOT," but nonetheless argues that Albright's argument is "unavailing." (Doc. #12 at 23-25). The Court agrees. "[W]here no apparent conflict exists between the VE's findings and the DOT, a substantial body of law holds that remand is not necessary." *Brown v. Comm'r of Soc. Sec.*, No. 15-10478, 2015 WL 12681367, at *16 (E.D. Mich. Oct. 20, 2015); *Kuzak v. Colvin*, No. 1:13CV754, 2014 WL 4545917, at *12 (N.D. Ohio Sept. 12, 2014) ("Although Social Security Ruling 00-4p imposes a duty upon the ALJ to inquire whether the VE's testimony is consistent with the DOT, where there is no actual conflict between a VE's testimony and the DOT, courts within this circuit have found that the ALJ's failure to make such an inquiry amounts to harmless error." (collecting cases)). This is particularly true where a claimant points to no apparent conflict. *Id.* ("Brown points to no apparent conflict between the DOT and the VE's testimony, thus remand would be inappropriate for this harmless error."). "[N]othing in applicable Social Security regulations requires the [ALJ] to conduct his or her own investigation into the testimony of a [VE] to determine its accuracy, especially when the claimant fails to bring any conflict to the attention to the ALJ." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008). Furthermore, "[i]f counsel believe[s] that there was an actual conflict between the VE's testimony and the DOT, he should . . . explore[] the matter at the hearing rather than first complaining upon judicial review." *Kuzak*, 2014 WL 4545917, at *12 (internal quotation omitted).

Here, Albright's attorney raised no conflict during the hearing, and Albright now points to no apparent conflict between the VE's testimony and the DOT in his motion. Thus, remand is

not warranted. *Id.* (holding that the ALJ's failure to strictly adhere to the mandates of SSR 00-4p "does not necessitate remand" where "during Plaintiff's cross examination of the VE, counsel did not assert any inconsistencies between the VE's testimony and the DOT"); *McKay v. Comm'r of Soc. Sec.*, No. 08-14530, 2010 WL 376324, at *11 (E.D. Mich. Jan. 25, 2010) (determining that where the plaintiff "has not alleged any conflict between the VE and the DOT[,] . . . since there is no unresolved conflict, the ALJ's failure to ask the VE whether his testimony is consistent is not reversible error or even error requiring remand" (internal citations omitted)).

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Albright's Motion for Summary Judgment [9] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: February 7, 2018                              s/David R. Grand
Ann Arbor, Michigan                                  DAVID R. GRAND
                                                     United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431

F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 7, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager